IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

DOROTHY TONEY,                          )
                                        )
          Plaintiff,                    )
                                        )
v.                                      ) CIVIL ACTION NO. 99-PWG-1618-S
                                        )
LOOMIS, FARGO & CO.,                    )
                                        )
          Defendant.                    )

### MEMORANDUM OF OPINION

Dorothy Toney, plaintiff herein, filed this complaint against Loomis, Fargo & Co., alleging

violations of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000, et seq.; 42

U.S.C. § 1981; and the Equal Pay Act.[1]  The parties have consented to the magistrate judge's

jurisdiction pursuant to 28 U.S.C. § 636(c)(1).  This matter is before the court on defendant's motion

for summary judgment. (Document #22).

Summary judgment is appropriate only if there are no genuine issues of material fact and the

movant is entitled to judgment as a matter of law.  Rule 56, *Federal Rules of Civil Procedure*.  In

making that assessment, the court must view the evidence in a light most favorable to the non-

moving party and must draw all reasonable inferences against the moving party.  *Celotex Corp. v.

Catrett*, 477 U.S. 317 (1986).  The burden of proof is upon the moving party to establish his prima

facie entitlement to summary judgment by showing the absence of genuine issues and that he is due

to prevail as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991).  Once

that initial burden has been carried, however, the non-moving party may not merely rest upon his

---

[1]     Based on Toney's concession that she is not entitled to overtime pay, her Fair Labor Standards  Act claim is
due to be dismissed and warrants no discussion. (See plaintiff's brief, p. 21).

pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be `no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [Citation omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

898 F.2d at 1532.

The following facts are undisputed or, if disputed, viewed in the light most favorable to Toney. Toney, a black female, began working for the Birmingham branch of Wells Fargo Armored Services Corporation in October, 1994 as a driver /messenger. (Toney depo, p.52). Wells Fargo later became Loomis Fargo. Before her employment with Loomis Fargo, Toney had no experience in the transportation or armored services industries. (Toney depo., pp.27-28). Toney became a vault custodian on September 1, 1996 and vault supervisor on November 1, 1996. (Toney depo., pp.57, 62-63, 71-73, 152). As vault supervisor, Toney supervised the driver/messenger employees and vault personnel and worked with customers. (Toney depo., pp.122, 129-30). A personnel change

2

report indicates that Toney became an operations supervisor on June 29, 1998. (Plaintiff's Exhibit 19); however, vault access lists dated September 9, 1998 and October 5, 1998 indicate that Toney was route supervisor while the vault access list dated January 8, 1999 indicates that Toney was vault supervisor. (Plaintiff's Exhibit 16).

As morning vault supervisor, Toney arrived at the Birmingham branch at 4:30 a.m. She performed a perimeter security check before opening the branch building. (Toney depo., pp. 80, 96-98). She also de-activated the vault alarm and opened the vault. (Toney depo., pp.100-102). Toney let the drivers into the building, handed out time cards, and distributed pre-sorted bags of money to be taken out by each driver on his or her route. (Toney depo., pp.100-02, 106-07). Toney distributed manifests to each driver. The manifests recorded the predetermined amount of money to be delivered to or picked up from each customer. (Toney depo., p.113). Until approximately February 1999, Toney was also responsible for the weekly work schedule for the Birmingham branch personnel. (Toney depo., pp.133-34, 140-41). Don Hyde was the vault supervisor for the evening shift. (Toney depo., p.99). Hyde checked in the trucks returning from their routes, checked in and counted the money that came in with the trucks, accounted for the liability in the vault, and secured the vault for the night. (Toney depo., p.196). Hyde has been employed by Loomis Fargo from 1985. (Hardy affidavit, ¶ 3).

Toney filed a charge of discrimination with the EEOC on February 3, 1999, alleging race discrimination in a promotion decision. (2/3/99 Charge of Discrimination). Mr. Struntz, the branch manager of Toney's group, left in November 1998. After Struntz left, John Hardy, the Alabama general manager for Loomis, asked Toney if she could perform his duties. (Toney affidavit). Toney

3

said yes, and Hardy said "OK, handle it." (Toney affidavit). He allegedly told her that she had no

supervisor. (Toney affidavit). Later Toney was interviewed for the position of operations manager:

> I asked Mr. Hardy to interview me for the job of operations manager. There was no job posting. Mr. Hardy did not have the written qualifications for operations manager at the interview. Nor did he ever tell me what those duties were.
>
> Mr. Hardy had not been in the building for many, many months (at least 4). He did not ask me any questions about how the business was being run for the 4 months that Mr. Struntz was absent.
>
> Mr. Hardy said absolutely nothing about what he was looking for in a operations manager. He sat there while I talked. I told him how I had been doing the operations job and that I was qualified. He never said a word or asked any follow-up questions. He didn't take notes. He didn't have my personnel file. The interview lasted ten minutes. I was interviewed in January, 1999. I went back and continued my duties and then Mr. Finch came in in February of 1999...

(Toney affidavit).

Hardy testified in his deposition that Will Finch, a white male, had superior skills to Toney

based on his four years of cash vault experience including two years in Atlanta, Georgia as cash

vault services supervisor. (Hardy depo., p.38) He also testified that Finch had superior "people

skills:"

> Q:    ... [H]ow much of this people skills business have to do in weighing of your decision to hire Finch over Toney?
>
> A:    Well, Will had been in several different managerial positions, and if he hadn't been in that type of position, I don't think the company would have continued promoting him those positions if he didn't have people skills.

. . . .

4

Q:    ... [H]ow did you know about Finch's people skills?

A:    Well, I talked to his previous supervisor, who was James Wolver in Pensacola to find out how he handled his employees, and that's one of the ones I've got.  And personnel in or a home office that knew him and knew of his skills, that's where I got it from.

(Hardy depo., pp. 40-41).

When Finch assumed the duties of operations manager, he also began to handle routing and scheduling the duties previously performed by Toney. (Toney depo, pp.140-41).  Although Toney had not regularly worked weekends for the previous 2 years, on April 21, 1999, Finch scheduled her to work the following Saturday. (Toney depo, p.214).[2]

A discussion between Toney, Finch and Hardy ensued:

Q:    You nevertheless refused to work that Saturday, correct?

A:    No, I didn't refuse it.

Q:    You didn't refuse it?

A:    No.

. . . .

Q:    They told you that you had to work on that weekend, right?

A:    Right.

Q:    What was your response?

---

[2]    During her first two years, Toney worked every other weekend along with other vault personnel and supervisors. (Toney depo., pp.135-36).  Toney then went to the Struntz and told him that she "needed to stop working on weekends for awhile." (Toney depo., pp.135-36).  It was company policy that all supervisors worked rotating weekends. (Finch depo., pp.12,42-43).  While Toney worked on the weekends that Mr. Sudsberry wanted to take off, she did not regularly work weekends on a rotating basis. (Toney affidavit, plaintiff's exhibit 4).  Sudsberry had requested that Toney schedule him for weekend work (Toney affidavit); however, Sudsberry commented or complained to Finch about Toney not having to work weekends. (Finch depo., pp.12,42-43).

A:    I told them that I hadn't been working on the weekends, so why should I do it now.

. . . .

Q:    ... during this time period, on Monday, Tuesday, Wednesday, during this April month, when you got terminated.  During this time period, what had happened was they had told you they wanted you to work on that Saturday and you had refused to do it, correct?

A:    Will told me.  And no, I did not refuse.

Q:    You tell me how you would characterize it if you don't like the word refused.

A:    Will had put me on the schedule.  I said, Will, I don't work on Saturdays and Sundays.  He said, You're going to work on Saturday now.  So I said, No, I'm not.  He said, We're going to talk to John.  I said, Okay.  So I went in my office and he went down and talked to John.  So John called me.  John said, I knew you weren't working on the weekends.  You're a little upset, so we're going to let you go home and we'll talk tomorrow.

. . . .

Q:    I understand that.  Will told you you had to work on the weekends, and you told him, no, I'm not, I haven't had to do that, we'll talk to John about it, right?

A:    Right.

Q:    And John told you, in the subsequent conversation when you got upset, that he wanted you to work on the weekends, correct?

A:    Right.

Q:    And you still told John you wouldn't work on –

A:    No, I didn't tell John that.

Q:    So what happened next?

A:    I went home.

Q:    Then what happened?

6

A:    The next day I came to work.

Q:    Tell me what happened when you got to work the next day.

A:    I got to work, and got everybody in and got all the trucks out, and I went in my office and started doing some paperwork. So John came up there, and he was talking to some of the other employees, and he came into my office and he asked me, Have you decided on what you were going to do. I said, Evidently you decided for me, because I see my name on the schedule. And he said, Well, do you want to voluntarily resign. I said, Do you want to voluntarily fire me. He said, That's what I'll do. And that's what he did.

. . . .

Q:    ... Did you tell him you would voluntarily work that weekend in order to keep your job?

A:    Sir, that did not arise.

Q:    It's a real simple yes or no, ma'am. Did you tell him that you would –

A:    The question was not asked to me.

. . . .

Q:    ... My question is did you tell him that you would work that Saturday voluntarily in order to keep your job, instead of being fired or resigning. Yes or no?

A:    I can't answer that.

Q:    Why not?

A:    Because it didn't go like that.

. . . .

Q:    ... Did you tell him that you would work that Saturday in order to keep your job? That's my question. Is that yes or no?

A:    Sir, I can't answer that because it didn't come out like that.

. . . .

Q:    (BY. MR. NORRIS) Ma'am, are you going to answer my question or not?

A:    Sir, that's what was said and that was it.  He gave me my papers and that was it.  He didn't say that.  I didn't say anything and he didn't say anything else.

. . . .

Q:    ... [D]id you have an understanding at that moment, when you were talking to John, that if you had said, okay, I will work like you've told me to work, that you would keep your job?

A:    Sir, it wasn't presented to me like that.

Q:    I'm asking you about your understanding.

A:    He didn't give me an ultimatum like that.  If he had given me an ultimatum, I would have responded.

Q:    I'm asking you about your understanding.  Did you understand that all you had to say was, I'll do what you want me to do?

A:    No.  I didn't have that understanding.

(Toney depo., pp.211-220).

Toney was discharged for insubordination for refusing to follow a direct work order. (Finch depo., pp.6-7; Hardy affidavit, ¶ 6).  Finch recommended Toney's termination.  (Finch depo, p.6)  Finch and Hardy made the final decision to terminate Toney (Finch depo., p.8); however, Hardy actually terminated her. (Hardy depo., p.31).  Finch and Hardy spoke to a member of human resources prior to terminating Toney and told human resources that Toney was refusing to work on Saturdays. (Finch depo, pp.9-10; Hardy depo., p.31).  On May 5, 1999, Toney filed a second charge with the EEOC, alleging that Loomis fired her in retaliation for filing the original EEOC charge regarding the promotion.  (5/5/99 Charge of Discrimination).

I.      Equal Pay Act Claim (sex)

In order for Toney to establish a *prima facie* case under the Equal Pay Act, she must show that Loomis "pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)(quoting 29 U.S. § 206(d)(1)); *Irby v. Bittick*, 44 F.3d 949 (11th Cir. 1995)).  The comparator used by Toney is Don Hyde, the evening vault supervisor.  Loomis argues that Toney cannot show that job of morning vault supervisor, the position held by Toney, and the job of night vault supervisor require equal responsibility.  Loomis argues:

> ...much of the work done by Hyde in the evenings was done specifically to prepare plaintiff for her very different responsibilities in the mornings.  For example, Hyde would collect and count the money brought in by the trucks returning from their runs in the afternoon, and then pre-sort and pre-count the orders for each customer. (*Id.* at 106-07,199). These pre-counted orders would be ready for plaintiff when she arrived each morning to hand them out to the departing drivers. *Id.* In addition, Hyde was required to tally all the money that was brought into the vault and to account for the entire liability, which would be left in the vault overnight. *Id.* at 196.  Plaintiff had no such responsibilities, and "the fact that [her] job did not include these significant additional responsibilities defeats her Equal Pay Act claim because there is no substantial identity of job

9

> functions between" her position and the evening vault
> supervisor position.

(Loomis's brief, pp.10-11.)

Toney's affidavit in which she stated that both she and Hyde did the same job "but in reverse,"would seem to militate against a finding that the morning and night vault supervisor positions involve a different degree of responsibility. "The plaintiff need not prove that the job held by her male comparator is identical to hers; she must demonstrate only that the skill, effort and responsibility required in the performance of the jobs are 'substantially equal.'" *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992). While job titles are entitled to some weight, the actual duties that the respective employees are called upon to perform is the controlling factor under the EPA. The parties clearly disagree as to the significance of the difference in duties, that is, whether the overall responsibility of Toney's job was substantially the same as that of Hyde. "If reasonable minds could differ on the inferences arising from undisputed facts then a court should deny summary judgment." *Miranda,* 975 F.2d at 1534. Because there is a genuine issue of material fact as to the similarity of the jobs held by Toney and Hyde, summary judgment is inappropriate unless Loomis establishes that although the jobs are substantially similar and there is a disparity in pay there is a "fact other than sex" that is responsible for the differential. *Irby*, 44 F.3d at 954.

Loomis argues that any difference in pay is justified by "factor[s] other than sex." 29 U.S.C. § 206(d)(1). Specifically, Loomis argues that any difference in salary is due to Hyde's greater experience in the armored services industry and length of service at Loomis. (Hardy affidavit, ¶ 3) Hyde had been employed by Loomis since 1985, nine years longer than Toney who had no prior

experience in armored services. (Toney depo, pp.27-28).[3/] Hyde was promoted to vault supervisor

in 1994 while Toney was promoted to vault supervisor in 1996. (Plaintiff's exhibits #19 and #20).

In *Irby* the Eleventh Circuit Court of Appeals discussed the correlation of experience and

longevity:

> Experience is an acceptable factor other than sex if not used as a pretext for differentiation because of gender.... Business reasons, such as experience, are legitimate "factors other than sex" so long as they can be rebutted. ... The defense of experience, however, is capable of being rebutted; for example, the plaintiff could show that he or she had equal or more experience of the same type. Time spent in a position equates with experience in the division; to gain experience one must necessarily spend time in an activity. Time is a measurable quantity one can sufficiently rebut.

44 F.3d at 956.

Hyde had not only more experience in armored services in general but he also had two years more

experience as vault supervisor.

Assuming Loomis is able to overcome the heavy burden of proving that the differential is

justified, Toney may rebut the explanation by presenting evidence of pretext. *Irby*, 44 F.3d at 954.

Toney argues that Loomis's proffer of experience and longevity is pretextual and that in order for

Hyde to be paid a larger salary based on experience, that experience must be "good" experience.

Toney observes that Hyde is banned for life from driving a truck for Loomis (plaintiff's exhibit #20)

concluding "certainly that is not good experience." The record before the court, however, does not

indicate the cause of the driving ban. There is, moreover, no evidence that the vault supervisor

---

[3/]   There is no evidence that Hyde had any armored services experience prior to being employed by Loomis.

position, which Hyde held for two years longer than Toney, involved driving.  Toney further argues that since she was promoted faster than Hyde a reasonable jury could find she was therefore a better employee.  This overlooks the obvious fact that the record does not reflect that a vault supervisor position was open prior to 1994 when Hyde was promoted.

Finally, Toney argues that Loomis's proffer of experience and longevity is pretextual because Toney's male replacement, Mr. Touchton, was paid more money than either Toney or Hyde when he was promoted to vault supervisor on June 10, 1999.  While Touchton's salary was $32,000 effective June 10, 1999 when he was promoted, Touchton had only been with Loomis since August 24, 1998 when he was hired as a vault clerk.  The record does not reflect whether Touchton had any armored services experience prior to being hired by Loomis.  Hardy testified in deposition:

> Q:    Can you tell me why the salaries of Mr. Touchton and Mr. Sudsberry for vault supervisor was set at $32,000?
>
> A:    Okay.  Back when Wells and Loomis merged in '99, I decided to try to bring all of the supervisory salaries up to a certain level with the Loomis salaries. And $32,000 was a level for that type of position so I was getting everybody up to a $32,000 mark.  That's the reason.
>
> Q:    And when did you make this decision to raise everyone's salary to thirty-two?
>
> A:    About mid-year, after the merger.
>
> Q:    Mid year '99?
>
> A:    Yeah.
>
> Q:    Which would have been after Toney's termination?
>
> A:    The merger was in '98.  The merger was in '98, not '99.
>
> Q:    Why didn't Toney get her raise to $32,000.

A:     Well, to the best of my knowledge, the last salary that Toney had was $31,900.

. . . .

Q:     All right. So what was your testimony again as to the question of, in 1998, mid '98, you decided to bump everybody to thirty-two?

A:     Yes, sir.

Q:     And my question was, was Toney's salary raised to $32,000 in 1998?

A:     No one's was raised to $32,000 in 1998. They had a gradual increase. With the companies merging, I went to the <u>Division Press</u> and tried to get this – so I could give everybody across the board a raise, and everybody was gradually increased except for the people that I promoted to supervisor. I started them at $32,000.

. . . .

Q:     All right. So my question is, is that Toney's terminated in April; Touchton becomes vault supervisor in June, and he would be performing the same duties as her; correct?

A:     Correct.

Q:     Can you tell me why he got the thirty-two grand when in April Toney did not get the $32,000 raise?

A:     That is the salary level that I set for the new supervisors. I was trying to bring everybody else up to that level, and I started him at $32,000. That was my decision.

Q:     Why didn't [you] start or raise Toney up to thirty-two?

A:     As far as my knowledge, Mrs. Toney was making $31,900, almost $32,000.

(Hardy depo, pp.21-25).

Toney, however, did not earn almost $31,900 in 1999, she received only $27,299.74. (Plaintiff's

Exhibit #2). Nevertheless, the fact that Loomis began to gradually increase salaries after the Wells

Fargo-Loomis merger and that Touchton was the beneficiary of the new salary structure immediately

upon being promoted does not establish that Loomis's reason for the disparity in pay between Toney and Hyde based upon experience and longevity is pretextual especially in light of the fact that Hyde, Toney's comparator, did not earn $32,000 during the relevant period. Loomis is entitled to summary judgment on this claim.

II.    Retaliation for filing EEOC charge of discrimination

In order to establish a *prima facie* case of retaliation, Toney must show: (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relationship between the two events. *Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001); *Gupta v. Fla. Bd. of Regents,* 212 F.3d 571, 587 (11th Cir. 2000), *reh. denied*, 229 F.3d 1171 (11th Cir. 2000), *cert. denied,* 531 U.S. 1076 (2001). It is undisputed that Toney participated in a protected activity when she filed her EEOC charge. *Pipkins, supra.* It is further undisputed that Toney was terminated - clearly an adverse employment action.

Loomis argues that Toney cannot demonstrate a causal connection between the filing of her EEOC charge complaining of the promotion and her termination. (Loomis brief, p.22). Loomis also asserts that one of the decisionmakers, Finch, was not even aware of the EEOC charge. A plaintiff may establish a causal link by showing "that the protected activity and the adverse action were not wholly unrelated." *Clover v. Total Systems Service, Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999), quoting *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985). "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." *Clover, supra,* quoting *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). A close temporal proximity between events

14

may also support a finding of causal connection.  See *Wascura v. City of South Miami*, 257 F.3d 1238, 1245 (11th Cir. 2001).   Finch testified that he "wasn't sure if [he] knew or not" about the EEOC charge when Toney was terminated. (Finch depo., p.42).   Hardy was aware of the EEOC charge prior to terminating Toney. (Hardy depo., p.14).   While Finch recommended Toney's termination, (Finch depo, p.6) Hardy actually terminated Toney. (Hardy depo, p.31).   Toney filed her charge of discrimination with the EEOC on February 3, 1999, and she was terminated on  April 22, 1999, less than ninety days later.   Toney has established that Hardy was aware of the EEOC charge when she was terminated.   The protected activity and her termination were in close proximity.   She has established a causal connection between her EEOC charge and subsequent termination sufficient to establish a *prima facie* case of retaliation.   "[T]he inference is raised that discriminatory intent motivated the adverse employment action, and the burden shifts to the employer to 'clearly articulate in a reasonably specific manner a legitimate non-discriminatory reason' for the adverse action with credible evidence."  *Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 702 (11th Cir. 1998).   Loomis relies on the deposition testimony of Hardy and Finch contending that Toney was terminated because she refused a direct request by her supervisor to work on a weekend.   Loomis has articulated a legitimate non-discriminatory reason for terminating Toney.

Toney must establish that the articulated reason for her termination was pretextual.  *Berman*, 160 F.3d at 702.   Toney maintains that when she returned to work the next day she did not refuse to work weekends.   Hardy asked Toney if she had decided what she was going to do and she replied that "it appears that you have decided that for me by putting me on the schedule."  Toney did not, however, reaffirm her statement of the day before that she would not work on weekends.   Toney's version of the facts is sufficient to allow a factfinder to disbelieve Loomis's proffered explanation

for terminating Toney, therefore, summary judgment is due to be denied as to Toney's retaliatory discharge claim.

III.     Overtime claim

Because Toney concedes that she is not entitled to overtime pay (Toney's brief, p.21), Loomis's motion for summary judgment is due to be granted as to the FSLA claim.

IV.     Race discrimination claims

Toney's remaining claims are based on allegations of race discrimination.  She offers circumstantial evidence as opposed to direct evidence of discrimination.  The burden-shifting framework established in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981) is applicable.  In *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1977), *cert. denied,* 522 U.S. 1045 (1998) the Eleventh Circuit Court of Appeals succinctly explained the shifting of burdens under the *McDonnell Douglas* framework:

> Under that framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. 253-54 & n. 6, 101 S.Ct. at 1093-94 & n.6.
>
> > Establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee.  If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.
>
> *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094 (footnote omitted).

16

The effect of the presumption of discrimination created by establishment of the *prima facie* case is to shift to the employer the burden of producing legitimate, non-discriminatory reasons for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. To satisfy that burden of production, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254-55, 101 S.Ct. at 1094 (citation and footnote omitted). "[T]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had *not* been motivated by discriminatory animus." *Id.* at 257, 101 S.Ct. at 1096 (emphasis added).

If a defendant carries its burden of producing legitimate, nondiscriminatory reasons for its decision, the presumption of discrimination created by the *McDonnell Douglas* framework "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Burdine*, 450 U.S. at 255 & n.10, 101 S.Ct. at 1094-95 & n.10. However, elimination of the presumption does "not imply that the trier of fact no longer may consider evidence previously introduced to establish a *prima facie* case." *Id.* at 255 n.10, 101 S.Ct. at 1095 n.10. As the Supreme Court has explained:

> A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence. Nonetheless, this evidence and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual. Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of

the defendant, will suffice to discredit the
defendant's explanation.

*Id.*

Once a defendant satisfies its intermediate burden of
production and the initial presumption of
discrimination accompanying the *prima facie* case has
been eliminated, the plaintiff has the opportunity to
discredit the defendant's proffered explanations for its
decision. According to the Supreme Court:

> [The plaintiff] now must have the opportunity
> to demonstrate that the proffered reason was
> not the true reason for the employment
> decision.... [The plaintiff] may succeed in this
> either directly by persuading the court that a
> discriminatory reason more likely motivated
> the employer or *indirectly by showing that the
> employer's proffered explanation is unworthy
> of credence.*

*Id.* at 256, 101 S.Ct. at 1095 (emphasis added)
(citation omitted). In other words, the plaintiff has
the opportunity to come forward with evidence,
including the previously produced evidence
establishing the *prima facie* case, sufficient to permit
a reasonable factfinder to conclude that the reasons
given by the employer were not the real reasons for
the adverse employment decision. *Id.*; *McDonnell
Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825.

106 F.3d at 1527-1528.

A.     Salary

Ordinarily, "if plaintiff makes a *prima facie* case under the EPA, she simultaneously

establishes facts necessary to go forward on a Title VII claim." *Mulhall v. Advance Sec., Inc.*, 19

F.3d 586, 598 (11ᵗʰ Cir. 1994), *cert. denied,* 513 U.S. 919 (1994). Defendant then bears the

exceedingly light version of rebutting the plaintiff's *prima facie* case by providing a legitimate non-

discriminatory reason for the differential in pay. *Id.* at 598-99.  Plaintiff must then demonstrate that the employer's reason was in fact pretextual.  *Id.*  Toney's discrimination claim is based on race while her EPA claim is premised upon sex.  She must first establish a *prima facie* case of race discrimination.

Loomis argues that Toney cannot establish that she was paid less than anyone who worked in a substantially similar position while relying on the argument advanced with respect to the pay claim that Hyde, her white comparator,  had greater responsibilities than plaintiff.  The record, however, does not disclose the nature of those duties nor the relevant differences.  Ms. Toney observes that she and Hyde did the same job "but in reverse."  There is no factual basis for concluding that she is wrong.  Toney has demonstrated a *prima facie* case of race discrimination.

Loomis argues that it has articulated a legitimate nondiscriminatory reason for paying Hyde more than Toney, again citing Hyde's greater experience in the armored services and his longer length of employment with Loomis. Although Toney's argument on this issue is unclear, apparently she seeks to rely on the pretext argument made with respect to her EPA claim. For the reasons stated earlier, Toney's allegations of pretext with respect to the difference in pay between Toney and Hyde are without merit with respect to the race discrimination claim.

Toney argues that she performed the duties of branch manager from November, 1998 when Struntz left until February 1, 1999.  The record is clear, however, that she received neither branch manager nor operation manager wages for the three months she performed this duty.  Toney has not identified what the branch manager's salary or pay rate at the time of her temporary service.  When Finch took over that job his salary was $45,000. (Plaintiff's exhibit #10).  Toney claims that she should have received the same salary.  Toney, however, has presented no evidence that she was

promoted to either assistant branch manager, branch manager, operations manager or even that she was temporarily designated as acting branch manager.  Toney testified that she did not perform additional duties during this interim.  (Toney depo., pp.154-160).

Toney alleges that she received lesser pay than either Touchton or Sudsberry.  Touchton was promoted to vault supervisor on June 10, 1999, less than two months after Toney's termination, with a salary of $32,000 (plaintiff's exhibit #11).  Sudsberry was promoted to vault supervisor on November 1, 1999 approximately six months after Toney's termination, with a $32,000 salary. (Plaintiff's exhibit #17).[4]  The fact that Touchton and Sudsberry received $32,000 upon being promoted to vault supervisor is not evidence of discrimination as Hardy was directed to address pay disparities between Wells and Loomis.  He decided that new supervisors would be started at $32,000 and that existing supervisors would be gradually increased.  While this decision may be questionable from business or employee morale standpoint, the fact that Hyde, a white male, also received less than $32,000 during this period contradicts Toney's claim that her lower salary was the product of race discrimination.  The motion for summary judgment is due to be granted on this claim.

B.      Failure to promote to operations manager

In order to establish a prima facie case of discrimination in promotion, Toney must prove:

> (1) that [s]he is a member of a protected class; (2) that [s]he was qualified for and applied for the promotion; (3) that [s]he was rejected; and (4) that other equally or less qualified employees who were not members of the protected class were promoted.

*Denney v. City of Albany*, 247 F.3d 1172, 1182 (11th Cir. 2001).

---

[4]      Although Sudsberry may have earned more than Toney prior to his November 1, 1999 promotion such amount appears to have been attributed to overtime which he earned as an hourly employee.  (Plaintiff's exhibit #12).

Loomis argues that Toney cannot establish that she was qualified for promotion to operations manager. (Loomis brief, p.18). Loomis relies on Hardy's deposition testimony that Toney "didn't have the cash vault services experience; she didn't have the operations experience; she lacked in people skills." (Hardy depo., p.33). Cash vault services include counting and balancing actual bags of cash and coins, as well as preparing paperwork showing transfers of money in and out of Loomis Fargo. (Hardy depo, pp.36-37). The operations skill "is supervising not only people, but supervisors doing the day-to-day operations, answering customers' questions." (Hardy depo, p.38.). Hardy testified that with regard to Toney's people skills:

> As far as the employees, I have listened to her on several occasions come out and holler and scream at the employees at the bay, at which time I would stop, stop her and talk to her and tell her she needs to improve her people skills because she was embarrassing employees in front of the other employees.
>
> . . . .
>
> And I've heard her on several occasions get mad with customers on the phone. At which time, I told her she needed to improve her skills.

(Hardy depo, p.39).

In her affidavit, Toney states:

> I had cash vault services experience. I had operations experience. I had people skills.
>
> I had years of experience in handling cash. The coin balancing was done by DeWitt Hood. He was the coin room supervisor. He handled all the coins. ... From time to time, Mr. Hood would ask me to help him with his coins and I would help.
>
> From 1996 to the time I was fired, we never had a person filling the job title of cash vault services

21

> supervisor in Birmingham. Yet this was something
> that we did. We had three persons doing cash vault
> services. Angela Coleman was the lead person for
> cash services. She was under Mr. Struntz when he
> was there, and then under me, when I took over the
> Branch manager duties.
>
> Say for example, if someone wanted a million dollars,
> you would not count that money. It would already be
> in a bag from the federal reserve. If someone wanted
> a smaller amount, then a bag from inventory would be
> opened, and the amount they needed removed,
> counted and sent. The remaining money would go
> back into inventory. I was very familiar with this
> procedure and the paperwork involved.

Toney described her operations experience:

> Mr. Struntz was my supervisor from 1996 to 1998 and
> he had me doing all of the day to day operations of
> the business. ... I took care [of] customer service.
> When the customers had a problem, they would call
> me. I performed the job of Branch manager for
> approximately four months [following Mr. Struntz'
> departure and Mr. Finch's arrival] ... In addition, I
> had been performing this job during the time that Mr.
> Struntz was the Branch manager, under his
> supervision.
>
> . . . .
>
> When Mr. Struntz left in November of 1998, I
> completely took over the Branch operation. Mr.
> Hardy asked me if I could perform all the duties that
> Mr. Struntz did. I said yes. Mr. Hardy said O.K.,
> handle it. He said that I had no one over me. He left
> and went to Huntsville. Mr. Hardy was gone, except
> for maybe twice a month, during the entire time that
> I ran the operation.

Toney further stated in her affidavit "I have never been short with any employees. I have never been

short with any customers." (Toney affidavit).

There is a genuine dispute of material fact related to Toney's cash vault services experience, operations experience and people skills. The disputed facts must be construed most favorably to Toney, the nonmoving party. She has offered some evidence that she was qualified for the promotion to operations manager.

Toney has established a *prima facie* case of discriminatory failure to promote. The burden shifts to defendant to produce a legitimate non-discriminatory reason for its failure to promote. *Denney*, 247 F.3d at 1183. Loomis attempts to satisfy this burden by arguing that "it is undisputed that the operations manager position went to Will Finch, a candidate with far greater qualifications than plaintiff's." (Loomis brief, p.19). Loomis argues that as cash vault services supervisor in Atlanta for approximately two years, Finch had cash vault services experience which Loomis maintains Toney lacked. (Hardy depo, pp.37-38). Loomis further states that Finch had prior experience as an operations manager (Finch depo, pp.70-71) and the people skills Toney lacked. (Hardy depo., pp. 40-41).

Loomis has produced a legitimate, non-discriminatory reason for its action. Toney bears the ultimate burden of proving the reason to be a pre-text for unlawful discrimination. *Id.* Toney argues that Loomis's proferred explanation is unworthy of credence because there is evidence from which a jury could conclude that Finch's skills did not motivate defendant's decision to promote Finch instead of Toney. Toney submitted Loomis's records of Finch's work history. Finch was transferred from Pensacola to Atlanta as an operations supervisor on June 26, 1998. (Plaintiff's exhibit 10). He was then promoted to operations manager in Birmingham on February 1, 1999. Finch therefore was in Atlanta seven months rather than 2 years, and according to Loomis's personnel records, he was an operations supervisor rather than a cash vault services supervisor.

23

There was no testimony to address this disparity.  Prior to his transfer to Atlanta, Finch was

operations supervisor in Pensacola from July 28, 1997.  He held that position less than one year

before he was transferred to Atlanta.  Although Finch testified that his title "should have been

operations manager [in Pensacola because] there is no title of operations supervisor" (Finch depo,

p.71), according to the  Loomis "New Employee or Change Report," he was an operations

supervisor.  (Plaintiff's exhibit #10).

Finch testified:

> Q:    ... You eventually became an operations supervisor?
>
> . . . .
>
> A:    Yes, I did.
>
> Q:    Now, when you became the operations supervisor in Pensacola, Florida, is
>       that the same type job –
>
> A:    I should have been operations manager.
>
> Q:    Operations manager.
>
> A:    There is no title of operations supervisor.
>
> Q:    When you became the operations manager in Pensacola, Florida in 1997;
>       right?
>
> A:    Yes, it was '97.
>
> Q:    Okay. Was that the kind of job you were doing when you got to Birmingham
>       and you were titled operations manager.
>
> A:    Just for different size terminals but, yes, it's the same job.

(Finch depo, pp.70-71).

Although defendants argue that Finch had superior qualifications based in part on his prior

experience as operations manager in Pensacola, the record does not support the conclusion that

Finch was an operations manager in Pensacola.  Moreover, Finch was not hired by Loomis until

May 31, 1996 when he was hired as a driver/guard and did not "have any experience in armored car." (Finch depo., p.70; Plaintiff's exhibit #10.)  A jury could conclude that it is unlikely that after only fourteen months as a driver/guard, Finch was promoted to operations manager - especially in the absence of any evidence of his managerial or supervisory experience before employment with Loomis.  Hardy did not refer in his deposition to Finch's prior position as operations manager in Pensacola, Florida as evidence of Finch's superior skills.

Hardy testified that Finch also had people skills:

> Q:  Well, Will had been in several different managerial positions, and if he hadn't been in that type of position, I don't think the company would have continued promoting him in those positions if he didn't have people skills.
>
>  . . . .
>
> Q:  Well, I guess my next question is, how did you know about Finch's people skills?
>
> A:  Well, I talked to his previous supervisor, who was James Wolver in Pensacola to find out how he handled his employees, and that's one of the ones I've got.  And personnel in or a home office that knew him or knew of his skills, that where I got it from.

(Hardy depo, pp.40-41).

Finch and Toney had approximately the same amount of experience as "operations supervisor." Toney, however, had between two and three years of supervisory experience during her employment at Loomis while Finch had a total of 18 months of supervisory experience during his employment at Loomis.[5]  There is no evidence that Finch or Toney had experience in the armored services industries prior to being employed by Loomis.  Hardy admitted that "on occasion [Toney] did good"

---

[5]   Toney had additional supervisory experience due to Toney's additional experience as route supervisor from 1996 until her title change on June 29, 1998.

in people skills. (Hardy depo., p.40). Hardy's only knowledge of Finch's people skills was from information furnished by Finch's former supervisor in Pensacola.

The record does not compel a finding that Finch was more qualified or even as qualified as Toney. Toney specifically has disputed the fact of her alleged weaknesses. Toney has presented sufficient evidence to allow a factfinder to disbelieve Loomis's proffered explanation for not promoting Toney. Summary judgment is due to be denied as to Toney's promotion claim.

C. Discharge claim

To establish a *prima facie* case of racial discrimination based upon termination, Toney must show that she was a member of a protected group, that she was adversely affected by an employment decision, that she was qualified for her position at the time of discharge and that a rational fact finder could conclude that her employer intended to discriminate against her in making the discharge decision. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998). Defendant does not address the racial discrimination based on discharge claim on the merits. Loomis argues that the claim is barred because it was not included in Toney's second EEOC charge. This argument has merit to the extent that the racial discrimination claim was based on Title VII. The same argument, however, is not relevant to a 42 U.S.C. § 1981 claim. While a plaintiff is required to file an EEOC claim prior to filing a Title VII action, there is no such requirement under 42 U.S.C. § 1981. *Patterson v. McLean Credit Union*, 491 U.S. 164, 180-81 (1989). Both Title VII and § 1981 require the same proof to show liability. *Standard*, 161 F.3d at 1330.

In support of her discharge claim based on race discrimination, Toney relies upon the same argument presented in her retaliation argument – that is, that the reason presented for Toney's discharge was a pretext for discrimination. Toney has presented sufficient evidence which would

26

permit a factfinder to disbelieve Loomis's proffered explanation for terminating Toney. Summary judgment is due to be denied as to Toney's § 1981 discharge claim based on racial discrimination.

A separate Order consistent with this Memorandum of Opinion will be entered simultaneously herewith.

DONE this the 20ᵗʰ day of November, 2002.

PAUL W. GREENE
UNITED STATES MAGISTRATE JUDGE